FILED

SEP - 7 2000

SAMUEL L. KAY, CLERK
U.S. DISTRICT & BANKRUPTCY COURTS
SOUTHERN DISTRICT OF WEST VIRGINIA

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
***AT CHARLESTON***

**WEST VIRGINIA HOUSING DEVELOPMENT FUND**, a West Virginia statutory corporation,

Plaintiff,

v. Civil Action No. 2:00-0841

**OCWEN TECHNOLOGY XCHANGE, INC.**,
Formerly known as Amos, Inc., a Connecticut corporation,
and, **OCWEN FINANCIAL SERVICES, INC.**,
Sometimes known as Ocwen Financial Corporation,
a Florida Corporation,

Defendants.

**NOTICE OF REMOVAL**

Comes now the defendants Amos, Inc., Ocwen Technology Xchange, Inc., Ocwen Financial Services, Inc. and Ocwen Financial Corporation (hereinafter sometimes collectively referred to as "these defendants")[1] by counsel, Michael M. Fisher, Esquire, Scott L. Summers, Esquire and Offutt, Fisher & Nord, and gives notice that on the 7th day of September, 2000, these Defendants did remove a civil action pending in the Circuit Court of Kanawha County, West Virginia styled *West Virginia Housing Development Fund v. Ocwen Technology Xchange, Inc, and Ocwen Financial*

1. On even date herewith, the undersigned counsel has filed with the Court motions to dismiss defendants Ocwen Financial Services, Inc. and Ocwen Financial Corporation in lieu of filing an Answer on behalf of those defendants. On even date herewith, the undersigned counsel has also filed with the Court an Answer on behalf of defendants Amos, Inc. and Ocwen Technology Xchange, Inc.

*Services, Inc.*, civil action number 00-C-1911, to the United States District Court for the Southern District of West Virginia at Charleston in accordance with the provisions of 28 U.S.C. § 1446. The Defendants further state as follows:

1. That the Plaintiff instituted a civil action in the Circuit Court of Kanawha County, West Virginia, as styled above.

2. That service of the Summons and Complaint was made upon Ocwen Technology Xchange, Inc. and Ocwen Financial Services, Inc. through the Office of the West Virginia Secretary of State on August 8, 2000. A copy of the Summons and Complaint is attached hereto as "Exhibit A."

3. Upon information and belief, Plaintiff is a West Virginia statutory corporation and West Virginia governmental instrumentality with its principal place of business in Kanawha County, West Virginia.

4. That Defendant Amos, Inc. is a Connecticut corporation with its principal place of business in West Palm Beach, Florida.

5. That Defendant Ocwen Technology Xchange, Inc. is a Florida corporation with its principal place of business in West Palm Beach, Florida.

6. That Defendant Ocwen Financial Services, Inc. is a Florida corporation with its principal place of business in West Palm Beach, Florida.

7. That Defendant Ocwen Financial Corporation is a Florida corporation with its principal place of business in West Palm Beach, Florida.

8. That at the time of the filing of this Notice, the citizenship of all parties remains unchanged.

9. That this lawsuit is a civil action at law whereby Plaintiffs seek monetary damages for an alleged breach of contract.

10. That in the Complaint filed herein, the Plaintiff did not seek a specific sum of recovery.

11. That Plaintiff, in its Complaint, seeks a joint and several judgment against Defendants for Plaintiff alleged "recoverable damages, pre-and post-judgment interest, costs, a reasonable attorney's fee, and all other relief the Court deems just."

12. That, upon information and belief, the amount in controversy exceeds, exclusive of interest and costs, the sum of Seventy-five Thousand Dollars ($75,000).

13. That complete diversity of citizenship exist in this matter and this Court has jurisdiction over this matter pursuant to 28 U.S.C.§ 1332.

14. That the only pleadings served in this matter to date are the Summons to Ocwen Technology Xchange, Inc. and Ocwen Financial Services, Inc. and Plaintiff's Complaint.

15. A certified copy of the docket sheet from the Clerk of the Circuit Court of Kanawha County, West Virginia is attached hereto as "Exhibit B."

16. That removal of this action is proper pursuant to 28 U.S.C. §§ 1332 and 1446.

17. That all of the Defendants consent to and join in this Notice of Removal.

**WHEREFORE**, these defendants submit this Notice of Removal for consideration of the Court herein and hereby give notice to the Clerk of the Circuit Court of Kanawha County, West Virginia, that said removal is hereby affected and that no further action be taken by the Circuit Court unless this action be remanded by the United States District Court for the Southern District of West Virginia at Charleston.

**AMOS, INC.,**
**OCWEN TECHNOLOGY XCHANGE, INC.,**
**OCWEN FINANCIAL SERVICES, INC.,**
**and**
**OCWEN FINANCIAL CORPORATION**

**By Counsel**

Michael M. Fisher, Esquire (#4353)
Scott L. Summers, Esquire (#6963)
***OFFUTT, FISHER & NORD***
208 Capitol Street, Fourth Floor
Post Office Box 2833
Charleston, West Virginia 25330-2833
(304) 343-2869

## CERTIFICATE OF SERVICE

I, Michael M. Fisher, counsel for these defendants do hereby certify that I have served the foregoing **"Notice of Removal"** upon counsel for the respective parties at the address below via United States Mail, first-class, postage pre-paid, this 7th day of September, 2000.

John Philip Melick, Esquire
JACKSON & KELLY, PLLC
Post Office Box 553
Charleston, West Virginia 25322
Counsel for Plaintiff

Michael M. Fisher, Esquire (WV #4353)

# SUMMONS

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

00 AUG 14 PM 2:52

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

WEST VIRGINIA HOUSING DEVELOPMENT FUND, a West Virginia statutory corporation,

Plaintiff,

v.

CIVIL ACTION NO. 00-C-1911

OCWEN TECHNOLOGY XCHANGE, INC., formerly known as Amos, Inc., a Connecticut corporation, and OCWEN FINANCIAL SERVICES, INC., sometimes known as Ocwen Financial Corporation, a Florida corporation,

Defendants.

A TRUE COPY
Cathy S. Gatson, cjc.

**To the above-named Defendant: Ocwen Financial Services, Inc.**
**c/o Corporation Service Company, Registered Agent**
**1675 Palm Beach Lakes Blvd., Ste. 1002**
**West Palm Beach, FL 33401**

IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby summoned and required to serve upon **JOHN PHILIP MELICK,** plaintiff's attorney whose address is **JACKSON & KELLY PLLC**, P. O. BOX 553, CHARLESTON, WEST VIRGINIA 25322, an answer, including any related counterclaim you may have, to the complaint filed against you in the above styled civil action, a true copy of which is herewith delivered to you. You are required to serve your answer within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint and you will be thereafter barred from asserting in another action any claim you may have which must be asserted by counterclaim in the above styled civil action.

Dated: 8/2/00

Cathy S. Gatson / BO
Cathy Gatson, Clerk of Court

By:____________________
*Deputy*

EXHIBIT
A

# NON-RESIDENT BOND

Civil Action No. 00-C-1911

00 AUG -7 PM 4:30

BO

Know All Men By These Presents:

Check for $100.00, deposited with Cathy S. Gatson, Clerk

THE CONDITION OF THE ABOVE OBLIGATION IS SUCH,

THAT WHEREAS, THE ABOVE Bound West Virginia Housing Development Fund, by and through his attorney, John Philip Melick, have this day instituted civil action in the Circuit Court of Kanawha County, West Virginia, against Ocwen Technology Xchange, Inc., for judgment to be determined by the Court. Plus costs in accordance with Chapter 56, Article 3 Section 33 Code of West Virginia 1931

NOW THEREFORE, if the said West Virginia Housing Development Fund shall pay all such costs and damages in which may be awarded against it on the failure of the plaintiff to prevail in said civil action,

then this obligation to be void, else to remain in full force.

A TRUE COPY
TESTE: Cathy S. Gatson (cjc) CLERK
CIRCUIT COURT KANAWHA COUNTY, W.VA

Acknowledged before me and approved.

Cathy S. Gatson / BO (SEAL)
Cathy S. Gatson, Clerk

August 7, 2000
Date

$100.00 RECEIVED
Rcpt

# CIVIL CASE INFORMATION STATEMENT
# CIVIL CASES

BD

In the Circuit Court of Kanawha County, West Virginia

I. CASE STYLE:

| Plaintiff(s) | Case # 00-C-1911 | |
|---|---|---|
| WEST VIRGINIA HOUSING DEVELOPMENT FUND | Judge Canady | |
| vs. | Days to | |
| Defendant(s) | Answer | Type of Service |
| OCWEN TECHNOLOGY XCHANGE, INC.<br>c/o Corporation Service Company<br>94 Hungerford Street<br>Street<br>Hartford, CT 06106<br>City, State, Zip | 30 | Secretary of State |
| OCWEN FINANCIAL SERVICES, INC.<br>c/o Corporation Service Company<br>1675 Palm Beach Lakes Blvd.<br>Suite 1002<br>Street<br>West Balm Beach, FL 33401<br>City, State, Zip | 30 | Secretary of State |
| Street<br>City, State, Zip | | |
| Street<br>City, State, Zip | | |

A TRUE COPY (ajc)
TESTE Cathy S. Gatson CLERK
CIRCUIT COURT KANAWHA COUNTY, W.VA

1.2

$ 75.00 ffck.
Rcpt # 310590
Return to atty.

**IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA**

BO

WEST VIRGINIA HOUSING DEVELOPMENT FUND, a West Virginia statutory corporation,

Plaintiff,

v. CIVIL ACTION NO. 00-C-1911

OCWEN TECHNOLOGY XCHANGE, INC., formerly known as Amos, Inc., a Connecticut corporation, and OCWEN FINANCIAL SERVICES, INC., sometimes known as Ocwen Financial Corporation, a Florida corporation,

Defendants.

A TRUE COPY
TESTE: CLERK
CIRCUIT COURT KANAWHA COUNTY, W.VA

**COMPLAINT**

West Virginia Housing Development Fund (the "Fund") states for its complaint against defendants:

1. The Fund is a West Virginia statutory corporation and West Virginia governmental instrumentality with its principal place of business in Kanawha County, West Virginia.

2. Defendant Ocwen Financial Services, Inc. ("OFC"), sometimes known as Ocwen Financial Corporation, is a Florida corporation with its principal place of business in West Palm Beach, Florida.

3. Defendant Ocwen Technology Xchange, Inc. ("Ocwen"), formerly known as Amos, Inc., is a Connecticut corporation wholly owned by OFC with its principal place of business in West Palm Beach, Florida.

4. Under date the 24th day of June, 1998, Ocwen (then known as Amos, Inc.) and the Fund entered into a written contract denominated a "Software License Agreement" and a written

contract denominated a "Support Agreement" (collectively, the "Contracts"). True copies of the Contracts are attached respectively as "Exhibit A" and "Exhibit B."

5. The Contracts resulted from a request for proposals circulated by the Fund to several potential providers of improved software needed by the Fund to perform financial servicing/accounting functions respecting the Fund's continuously increasing mortgage loan portfolio of single family and multi-family mortgages and other mortgage loans and related functions.

6. The response by Amos, Inc. (now Ocwen) was selected by the Fund as best for the Fund's purposes and, after various consultations with and elaborations by representatives of Ocwen, the Contracts were duly executed.

7. Since execution of the Contracts, although frequently demanded by the Fund, Ocwen has failed and refused to perform and has breached the Contracts by:

a. Entirely failing to deliver essential parts of the software product including particularly required "Documentation" and a program for administration of multi-family housing mortgages;

b. Delivering software product that was nonconforming, defective, and unusable;

c. Failing in all attempts to cure the short, nonconforming, defective, and unusable product that was delivered; and

d. Providing services that were fruitless because of the defective software product and/or the lack of Ocwen's abilities proffered in the Contracts.

8. Because of the breaches alleged in ¶ 7, above, the Fund revoked its acceptance of the products tendered by Ocwen, offered to deliver that product to a custodian to protect the integrity thereof for evidentiary purposes, and demanded that Ocwen repay to the Fund all sums the Fund paid under the Contracts to Ocwen and to third parties as directed by Ocwen and respond in damages to the

Fund for the wholly wasted costs the Fund incurred and expended in fruitless attempts to utilize the products and services tendered by Ocwen.

9. Ocwen has denied all liability to the Fund and instead has offered further software goods and services at some uncertain future time at allegedly reduced prices, which offer is totally unacceptable to the Fund.

10. Upon information and belief, Ocwen, as a wholly owned subsidiary corporation of OFC, is merely a grossly undercapitalized agent of OFC, Ocwen is the alter ego of OFC, and Ocwen is so managed and controlled by OFC, so that OFC is legally liable for all debts and obligations of Ocwen including all debts and liabilities of Ocwen to the Fund.

WHEREFORE, the Fund seeks joint and several judgment against defendants for its recoverable damages, pre- and post-judgment interest, costs, a reasonable attorney's fee, and all other relief the Court deems just. **A TRIAL BY JURY IS DEMANDED.**

WEST VIRGINIA HOUSING
DEVELOPMENT FUND, a West
Virginia statutory corporation

By Counsel

James K. Brown (W.Va. #489)

John Philip Melick (W.Va. #2522)
JACKSON & KELLY PLLC
Post Office Box 553
Charleston, West Virginia 25322
(304) 340-1000

PLAINTIFF'S EXHIBIT A

JUL 17 1998

SOFTWARE LICENSE AGREEMENT

THIS SOFTWARE LICENSE AGREEMENT (the "Agreement") is entered into by and between AMOS, Inc., a Connecticut corporation having a principal place of business at 384 Old Turnpike Road, Southington, Connecticut 06489 ("Licensor"), and the customer identified on the signature page hereto ("Customer"), and is effective as of the 24 day of June 1998 (the "Effective Date").

WHEREAS, Licensor is the owner of the computer software which is identified on Schedule 1 attached hereto; and

WHEREAS, Customer wishes to license such computer software for Customer's internal use only.

NOW, THEREFORE, in consideration of the foregoing and in consideration of the license and other fees paid and to be paid by Customer to Licensor, and for other consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows.

1. DEFINITIONS.

1.1. "Documentation" means the published materials provided to Customer by Licensor for the Licensed Software.

1.2. "Error" means a verifiable and reproducible failure of the Licensed Software to conform in a material respect to the Documentation. For the purposes of this Agreement "Errors" do not include any nonconformity resulting from Customer's misuse, improper use, alteration or damage to the Licensed Software, or Customer's combining, using or merging the Licensed Software with any hardware or software not supplied or identified in writing as compatible with the Licensed Software.

1.3. "Error Correction" means any work around or software modification that causes the Licensed Software to substantially conform to the Documentation or a procedure or routine that, when observed in the regular operation of the Licensed Software, eliminates the practical adverse effect of an Error.

1.4. "License Agreement" means this License Agreement.

1.5. "Licensed Software" means the computer software identified on Schedule 1, the Documentation, Releases, materials, Updates, enhancements, modifications and

Error Corrections, as well as any media containing or embodying the computer software identified on Schedule 1, that Licensor may provide to Customer from time to time. Licensed Software shall not include Third Party Software (as defined below).

1.6. "Releases" means a new version of the Licensed Software as designated by Licensor.

1.7. "Third Party Software" means the computer software identified on Schedule 2.

1.8. "Updates" means corrections, changes and improvements to the Licensed Software which (i) relate to the operating performance of the Licensed Software but do not change the basic function of the Licensed Software, (ii) are intended for general commercial use in connection with the Licensed Software, and (iii) are part of a standard Licensor maintenance release for the Licensed Software. Updates do not include Releases.

2. LICENSE GRANT. Licensor hereby grants to Customer, upon the terms and conditions contained herein, a non-transferable, non-exclusive license to use, in the manner and subject to any restrictions set forth on Schedule 1 attached hereto, at the location indicated on Schedule 1, the Licensed Software in object code form only during the Term (as defined below). Any rights not expressly granted to Customer are reserved by Licensor.

3. THIRD PARTY SOFTWARE. The terms and conditions of this Agreement shall control Customers use of the Third Party Software; provided, however, that where the terms and conditions of this Agreement conflict with the terms and Conditions of the Third Party Software license agreement, the Third Party Software license agreement shall control. Customer understands and acknowledges that the Third Party Software from Progress Software Corporation (the "Progress Software") is required to operate the Licensed Software. Customer shall not copy, modify, or reverse engineer any Third Party Software nor remove, alter, cover, obfuscate any copyright notices or other proprietary rights notices places or embedded on or in any part of the Third Party Software.

4. NO RIGHT TO SUBLICENSE OR ASSIGN: LIMITED RIGHT TO CHANGE LOCATION. Customer's limited rights under this Agreement may not be assigned, licensed, sublicensed or otherwise transferred voluntarily or by operation of law. Any

attempted assignment, license, sublicense or transfer, whether voluntary or involuntary, shall be void and shall be grounds for termination of this Agreement. Subject to the foregoing restrictions, the Customer shall be entitled to change the location at which the Customer uses the Licensed Software; provided, however, that (i) Customer provides written notice of such change of location to the Licensor at least thirty (30) days prior to such change, (Schedule 1 shall hereby be deemed to be amended accordingly) and, (ii) the Licensed Software and all Documentation is completely removed from the prior location.

5. REPRESENTATIONS AND WARRANTIES OF CUSTOMER. Customer represents and warrants to Licensor that Customer is not, and shall not become during the Term, a software vendor, service bureau or competitor of Licensor and that, without limiting the generality of the confidentiality restrictions set forth below, under no circumstances will Customer allow a software vendor, service bureau or competitor of Licensor to access, view or use the Licensed Software or any portion thereof. Customer hereby acknowledges that Licensor's parent corporation, Ocwen Financial Corporation ("Ocwen"), directly and/or indirectly, may engage in business activities similar or identical to those of Customer, including without limitation, servicing of residential and commercial mortgage loans.

6. ACKNOWLEDGMENT OF OWNERSHIP. Customer acknowledges and agrees that the Licensed Software, together with all ideas, architecture, algorithms, models, processes, techniques, user interfaces and "know-how" embodying the Licensed Software is the proprietary property of Licensor. Licensor is the owner of the Licensed Software, and Licensor shall at all times retain title to the Licensed Software, including without limitation, any changes or modifications made to the Licensed Software at Customer's request.

7. INTEGRITY OF DATA. Customer shall be responsible for the integrity of any data input into the Licensed Software and output from the Licensed Software. In addition, Customer agrees to ensure that any data input into the Licensed Software and output from the Licensed Software is complete, accurate and correct. Customer agrees to indemnify, defend and hold harmless Licensor and its affiliates from any actions, proceedings, damages, costs and expenses incurred by Licensor or its affiliates in connection with Customer's breach of this Section 7.

8. NO LIENS OR ENCUMBRANCES. Customer agrees to keep the Licensed Software free and clear of any and all claims, liens and encumbrances attributable to, or arising

out of Customer's use or possession of the Licensed Software. Any act of Customer, whether voluntary or involuntary, purporting to, or having the likely effect of creating a claim, lien or encumbrance on the Licensed Software shall be void and shall be grounds for termination of this Agreement.

9. RESTRICTIONS ON COPYING LICENSED SOFTWARE. Customer may make a reasonable number of copies of the Licensed Software for backup purposes only in accordance with Customer's ordinary backup procedures. Such copy or copies of the Licensed Software shall include, in readable format, any and all confidentiality, proprietary and/or copyright notices or markings contained on the original provided by Licensor. Customer shall make no other copies of the Licensed Software, nor shall Customer allow or permit the Licensed Software to be copied by a third party.

10. NO REVERSE ENGINEERING. The Customer hereby agrees not to modify, decompile, disassemble or reverse engineer the Licensed Software, or authorize, assist or permit any third party to modify, decompile, disassemble or reverse engineer the Licensed Software.

11. CONFIDENTIALITY. Customer acknowledges and agrees that the Licensed Software is an unpublished original work of authorship of Licensor and constitutes a valuable and confidential TRADE SECRET of Licensor, is protected under civil and criminal law and under the law of copyright, and shall not be disclosed in any form by Customer. Customer agrees that it will, (a) treat the Licensed Software, together with all ideas, architecture, algorithms, models, processes, techniques, user interfaces and other "know-how" embodied therein as well as all negotiations between Customer and Licensor with respect to this Agreement, the terms, conditions and other provisions of this Agreement and any information disclosed by third parties to Licensor which is required to be kept confidential by Licensor (collectively, the "Confidential Information"), as the confidential property of Licensor, (b) not use (except as authorized herein), disclose or otherwise make available or allow to be used, disclosed or made available the Confidential Information by or to any third party (other than independent contractors of the Customer who have a need to know such Confidential Information in order to perform the services requested by the Customer) and, (c) maintain the confidentiality of the Confidential Information as it would its own most highly confidential information. Customer agrees to clearly notify its officers, directors, agents, employees or independent contractors who have access to the Confidential Information of Customer's obligations hereunder and ensure that all such persons execute written agreements containing appropriate confidentiality obligations set forth

herein. Notwithstanding the foregoing, Confidential Information shall not include any information which Customer can prove through documentary evidence, (i) is or becomes available in the public domain, other than through the fault of Customer, (ii) is disclosed to Customer by a third party who is legally entitled to disclose such information or, (iii) is known by Customer prior to its disclosure by Licensor.

11.1. Disclosure. Customer agrees to immediately notify Licensor if Customer obtains information as to any unauthorized possession, use or disclosure of any portion of the Confidential Information by any person or entity, and to cooperate with Licensor in protecting Licensor's property and enforcing Licensor's rights.

11.2. Indemnity. Customer agrees to indemnify, defend and hold harmless Licensor and its affiliates and subsidiaries for all damages, costs and expenses (including reasonable attorney's fees) incurred by Licensor or its affiliates and subsidiaries in connection with any breach by Customer of its obligations under this Section 11.

12. LICENSE FEE. Customer agrees to pay Licensor the license fee set forth on Schedule 1. Customer agrees to pay this fee in the manner proscribed on Schedule 1. Customer also agrees to pay Licensor, upon execution of this Agreement, the amounts set forth on Schedule 2 with respect to Third Party Software. Customer understands and agrees that the terms and conditions of this Agreement apply only to the granting of a license for the Licensed Software. All fees relating to the installation, training and support of the Licensed Software and Third Party Software and/or the Progress Software shall be set forth in a separate support agreement.

13. LIMITED WARRANTIES. The following shall be the sole warranties provided by Licensor to Customer:

13.1. Performance Warranty. Licensor extends to Customer the following limited warranty for the period of time (the "Warranty Period") beginning on the Effective Date of this Agreement and ending on the earlier to occur of (i) ninety (90) days following the date of installation of the Licensed Software on the Customer's computer system or, (ii) one hundred eighty (180) days following the date of the initial delivery of the Licensed Software to the Customer. The Licensor warrants that during the Warranty Period the Licensed Software will substantially conform to the then current Documentation. During the Warranty

Period, Licensor shall remedy any Error in the Licensed Software, provided, that Customer notifies Licensor in writing of such Error and provides Licensor with a complete and accurate description of the Error, immediately upon discovery of the Error. The foregoing limited warranty shall not apply to Errors that arise due to any modifications, changes or enhancements made, from time to time, to the Licensed Software at Customer's request. Errors that arise after the Warranty Period shall be corrected in accordance with the Standard Support Agreement, provided, that the parties enter into a Standard Support Agreement.

13.2. Warranty of Title. Licensor hereby warrants to the Customer that, (a) Licensor has the right to license the Licensed Software to the Customer pursuant to the terms hereof and, (b) the Licensed Software does not infringe on any United States patent issued prior to the date hereof.

13.3. Conditions. The above warranties are conditioned upon, (a) the use of the Licensed Software strictly in accordance with the Documentation and other instructions provided by Licensor and, (b) the absence of any misuse or defect in the Licensed Software caused by Customer.

13.4. *Third Party Software. No representations or warranties are made by Licensor* as to any Third Party Software.

14. EXCLUSIVE REMEDIES. The following shall be the Customer's sole and exclusive remedies for Licensor's breach of the limited warranties set forth in Section 13:

14.1. Breach of Performance Warranty. In the event of a breach of the performance warranty provided in Section 13.1, Licensor shall, at Licensor's sole option (i) modify the Licensed Software so that it substantially conforms to the Documentation; (ii) provide an alternative solution that is reasonably acceptable to Customer; or (iii) refund to Customer the License Fees actually paid by Customer to Licensor for such non-conforming Licensed Software and terminate this Agreement with respect to such Licensed Software.

14.2. *Breach of Warranty of Title. Licensor hereby agrees to indemnify and hold* Customer harmless from and against any and all claims, demands, actions, costs, liabilities and losses arising out of a breach of the warranty of title provided in Section 13.2. Any such indemnification shall be contingent on the Customer, (a) immediately notifying Licensor in writing of any such claim,

demand, action, cost, liability or loss or threat thereof, (b) cooperating with Licensor in the defense or settlement thereof and (c) allowing Licensor to control such defense or settlement. Customer shall be entitled to participate in such defense at its own cost. Should the Licensed Software become or, in the opinion of Licensor, is likely to become the subject of an infringement claim by a third party, Licensor may, at Licensor's sole option, (i) procure for Customer the right to continue to use the Licensed Software; (ii) replace the Licensed Software or any part thereof with a non-infringing substitute; (iii) modify the Licensed Software so as to be non-infringing or (iv) refund any License Fees paid by Customer to Licensor for such Licensed Software and terminate this Agreement with respect to such Licensed Software.

15. DISCLAIMER OF OTHER WARRANTIES. EXCEPT AS SET FORTH IN SECTION 13 OF THIS AGREEMENT, LICENSOR MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO THE LICENSED SOFTWARE, ANY THIRD PARTY SOFTWARE, ANY SERVICES PROVIDED TO CUSTOMER, OR ANY OTHER MATTER WHATSOEVER, AND DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ALL IMPLIED WARRANTIES REGARDING THE CONDITION OF THE LICENSED SOFTWARE, ITS MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. LICENSOR DOES NOT WARRANT THAT THE LICENSED SOFTWARE OR ANY THIRD PARTY SOFTWARE WILL MEET ALL OF CUSTOMER'S BUSINESS REQUIREMENTS OR WILL OPERATE IN A PARTICULAR COMPUTER ENVIRONMENT OR THAT THE OPERATION OF THE LICENSED SOFTWARE WILL BE UNINTERRUPTED OR ERROR-FREE.

16. LIMITATION OF LIABILITY. IN NO EVENT WILL LICENSOR'S TOTAL CUMULATIVE LIABILITY EXCEED THE TOTAL LICENSE FEE ACTUALLY PAID BY CUSTOMER TO LICENSOR FOR THE LICENSED SOFTWARE THAT MAY HAVE CAUSED SUCH LOSS OR DAMAGE. UNDER NO CIRCUMSTANCES WILL LICENSOR BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES, LOSS OF PROFITS, OR LOSS OF GOODWILL RESULTING FROM OR RELATING TO THE DELIVERY (OR THE FAILURE THEREOF), INSTALLATION, OPERATION, MAINTENANCE, SUPPORT OR USE OF, OR INABILITY TO USE, THE LICENSED SOFTWARE OR THIRD PARTY

SOFTWARE, REGARDLESS OF WHETHER LICENSOR KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES.

THE LIMITATIONS OF LIABILITY AND DISCLAIMERS OF WARRANTY STATED HEREIN FORM AN ESSENTIAL BASIS OF THE BARGAIN BETWEEN THE PARTIES AND SHALL CONTINUE TO APPLY EVEN IN THE EVENT THAT ANY EXCLUSIVE REMEDY HEREUNDER FAILS OF ITS ESSENTIAL PURPOSE.

17. NON-SOLICITATION. Customer hereby agrees not to hire or attempt to hire, directly or indirectly, any of the employees or independent contractors of Licensor, its subsidiaries and affiliates during the term of their employment with or engagement by Licensor or for a period of six months after the termination of their employment or engagement with Licensor. Customer hereby agrees not to cause or attempt to cause any of the employees or independent contractors of Licensor, its subsidiaries and affiliates to terminate his or her relationship with the Licensor without the prior written consent of Licensor.

18. INJUNCTIVE RELIEF. In the event of any breach or threatened breach of the provisions of Sections 4, 5, 8, 9, 10, 11 and 17 hereof, Licensor shall be entitled to a temporary or permanent decree or order restraining and enjoining such breach or potential breach, it being hereby expressly acknowledged and understood that damages at law will be inadequate.

19. TERM AND TERMINATION. The term of this Agreement (the "Term") shall commence on the Effective Date and shall continue until the first to occur of the following:

(a) thirty (30) years from the Effective Date;

(b) sixty (60) days following written notice from the Customer to Licensor of the Customer's intention to terminate this Agreement;

(c) at the option of one party (the "Non-Defaulting Party"), upon written notice to the other party (the "Defaulting Party"), if the Defaulting Party fails in any material respect to perform or observe any covenant, condition or agreement to be performed or observed by it hereunder for a period of thirty

(30) days after written notice, or fails to cure the breach of any representation or warranty; or

(d) upon the Bankruptcy of the Defaulting Party. For purposes hereof, "Bankruptcy" shall mean the commencement by or against any party of a case under the federal bankruptcy laws or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by such party to, or the entry of an order or decree granting, the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of such party or for any substantial part of his or its property, or the making by such party of any assignment for the benefit of creditors, or the taking of actions by such party in furtherance of any of the foregoing.

20. EFFECT OF TERMINATION. In the event of the termination of this Agreement for any reason:

(a) Customer shall be liable for all fees and charges incurred prior to the date of termination;

(b) Customer shall promptly return to Licensor the original and all copies of the Licensed Software, including all Documentation and any related materials furnished by Licensor to Customer hereunder;

(c) the provisions of Sections 6, 8, 9, 10, 11, 15, 16, 17, 18, 21 and 22 shall survive termination of this Agreement for any reason; and

(d) except as specifically set forth herein, no license or other fees shall be refunded or returned to Customer.

21. AUDIT RIGHTS. In order to enable Licensor to verify that Customer is complying with the provisions of this Agreement, upon not less than five (5) business days' notice to Customer, Licensor shall be given access to Customer's premises in order to examine, copy and extract from Customer's books and records all information as Licensor may reasonably request in order to verify the payments due hereunder and Customer's compliance with the terms of this Agreement. Such audit shall be at the expense of Licensor unless the audit indicates that Customer is in breach of any term or condition hereof, in which event Customer shall pay all the costs of the audit, and shall forthwith pay to Licensor, (i) all amounts owed to Licensor plus interest on such amounts at an annual rate equal to the prime rate of interest

published in The Wall Street Journal (Eastern edition) plus 3%, from the date such payments should have been made to Licensor and, (ii) shall immediately cure such breaches. Nothing contained herein shall limit Licensor's right to terminate this Agreement pursuant to Section 19 as a result of such audit.

22. MISCELLANEOUS.

22.1. Independent Contractors. Each party hereto is an independent contractor and nothing contained herein shall be construed to create a partnership, joint venture or agency relationship between Licensor and Customer, nor shall either party be authorized to bind the other in any way.

22.2. Remedies Not Exclusive; No Waiver; Amendments. Except as otherwise specifically provided herein, no remedy referred to in this Agreement is intended to be exclusive. No delay by Licensor or Customer in exercising any of their respective rights or remedies hereunder shall be deemed to be a waiver of such rights or remedies. No waiver by either party of any breach by the other party hereunder shall in any way be a waiver of any future breach. Any waiver, amendment or modification of this Agreement must be in writing and signed by the party against whom enforcement is sought.

22.3. Assignment. Licensor shall have the right to transfer or assign this Agreement to any other person or entity without the consent of the Customer. Customer shall not have the right to assign or transfer this Agreement or any rights hereunder without the prior written consent of Licensor, which consent may be withheld for any reason or no reason. Any change in control of Customer, whether by merger, stock acquisition or otherwise, shall be deemed to be an attempted assignment of this Agreement and shall be grounds for termination. Subject to the prohibition on Customer's assignment, license, sublicense and transfer contained herein, this Agreement will be binding upon and will inure to the benefit of the successors and permitted assigns of the parties hereto.

22.4.. Taxes. Customer agrees to pay any sales, use, import or other taxes or levies associated with this Agreement and the Licensed Software.

22.5. Governing Law; Jurisdiction; Costs. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida. Customer hereby irrevocably consents and agrees that any action or proceeding hereunder may be

instituted in state or federal court located in Palm Beach County, Florida, and hereby irrevocably submits to the jurisdiction of such courts in any such action or proceeding. Customer shall reimburse Licensor for its reasonable costs and expenses incurred in enforcing its rights hereunder in the event of a breach or threatened breach by the Customer.

22.6. Severability. In the event that any provision of this Agreement shall be determined by a court of competent jurisdiction to be invalid or unenforceable, such provision shall, to such extent as it shall be determined to be invalid or unenforceable, be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of this Agreement.

22.7. Captions. The captions of this Agreement are solely for reference and have no legal effect whatsoever and will not in any way affect the interpretation or construction of this Agreement.

22.8. Force Majeure. Neither party will be liable for damage due to any cause beyond its control, including without limitation acts of God, acts of civil or military authority, labor disputes, failure or delay of suppliers or systems, including communications and power systems, fire, sabotage, war, embargo or acts or omissions of the other party caused by any of such events.

22.9. Government Requirements and Approvals. Customer hereby agrees that it will not ship or divert for use in any country any of the Licensed Software, Documentation or technical data with respect thereto in contravention of the laws and regulations of the United States or knowingly allow such shipping or diversion. Customer shall obtain all required governmental approvals necessary in connection with this Agreement. Without limiting the generality of the foregoing, Customer acknowledges that its exportation of the Licensed Software and Documentation is subject to the United States Export Administration Act of 1979, as amended (the "Act"), and Customer warrants and represents that it will comply in all respects with the Act. Customer agrees to indemnify, defend and hold harmless Licensor against any claim, loss, liability or damage suffered or incurred by Licensor arising out of or relating to any failure to comply with the Act or any rules or regulations relating thereto.

22.10. Notices. All notices and other communications hereunder shall be in writing and shall be deemed given: (a) upon receipt if delivered personally (unless subject to clause (b)) or if mailed by registered or certified mail receipt requested, postage prepaid; (b) at noon on the business day after dispatch if sent by a nationally recognized overnight courier; or (c) upon the completion of transmission (which is confirmed by telephone or by a statement generated by the transmitting machine) if transmitted by telecopy or other means of facsimile which provides immediate or near immediate transmission to compatible equipment in the possession of the recipient, in any case to the parties at the following addresses or telecopy number (or at such other address or telecopy number for a party as will be specified by like notice):

If to Licensor:
Ocwen Financial Corporation
The Forum, Suite 1002
1675 West Palm Beach, FL 33401
Attention: Secretary
Telecopy Number: (561) 682-8177
Confirmation Number: (561) 682-8000

With a copy to
AMOS, Inc.
P.O. Box 369
Southington, CT 06489
Attention: Daniel J. Paradis
Telephone No.: (860) 621 3796
Telephone No.: (860) 621 3796

If to Customer:
West Virginia Housing Development Fund
814 Virginia Street East
Charleston, WV 25301
Attention: Joseph Hatfield
Telephone No.: 800-933-1272
Facsimile No.: 304-343-2081

23. ENTIRE AGREEMENT. This Agreement constitutes the entire agreement between Licensor and Customer pertaining to the subject matter hereof and supersedes all proposals or prior and contemporaneous agreements or understandings of the parties regarding such matter. TERMS AND CONDITIONS CONTAINED IN ANY PURCHASE ORDER OR OTHER ORDERING DOCUMENT SUBMITTED BY CUSTOMER SHALL NOT BE DEEMED TO MODIFY OR SUPERSEDE THE TERMS OF THIS AGREEMENT.

24. SUBSEQUENT ASSET SERVICING AGREEMENT. In the event Customer subsequently engages Ocwen or any of its affiliates for any services, including without

limitation, servicing residential or commercial mortgage loans, the Customer shall enter into a new agreement with Ocwen which may replace, supersede and terminate this Agreement and the Support Agreement, if any, in their entirety.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed on the dated forth below.

LICENSOR:
AMOS, Inc., a Connecticut corporation
By: Gilbert Lowe
Name: Gilbert Lowe
Title: President
Date: 7/10/98

Customer: West Virginia Housing Development Fund
Print Name: Joe W. Hatfield
By: Joe W. Hatfield
Name:
Title: Exec Dir
Date: 6-24-98

SCHEDULE 1
LICENSED SOFTWARE

| Product: | Number of Users | License Fee |
|---|---|---|
| Loan Servicing! | 30 | $68,000 |
| REO! | 5 | $10,000 |
| Collections! | 10 | $20,000 |
| GL Interface* | Unlimited | $5,000 |
| Workflow Manger! | 35 | $35,000 |
| | | |
| Total Amos Software | | $138,000 |

Licensed Software Payment Terms:

$69,000 (50% of the total Licensed Software fee) due upon execution of the Agreement
$48,300 (35% of the total Licensed Software fee) due upon installation of the Licensed Software.
$20,700 (15% of the total Licensed Software fee) due within thirty (30) days of installation of the Licensed Software

Location Where Customer May Use Licensed Software: West Virginia Housing Development Fund
814 Virginia Street, East
Charleston, WV 25301

SCHEDULE 2
THIRD PARTY SOFTWARE

| | Tier of Users | Per User Cost | Number of Users | License Fee |
|---|---|---|---|---|
| Progress Software Version 8 | | | | |
| Enterprise Server | 25-49 | $640.00 | 35 | $22,400.00 |
| Client Networking | 25-49 | $110.00 | 35 | $3,850.00 |
| ProVISION Dev. Lic. | 1-4 | $3,820.00 | 1 | $3,820.00 |
| Actuate End User | 10-24 | $210.00 | 10 | $2,100.00 |
| Desktop | | | | N/A |
| Total Progress | | | | $31,170.00 |
| Jet Form Central | | | Unlimited | $3,890.00 |

Payment Terms: Payment in full due upon execution.

JUL 17 1998

PLAINTIFF'S EXHIBIT B

SUPPORT AGREEMENT

THIS SUPPORT AGREEMENT (the "Agreement") is entered into by and between AMOS, Inc., a Connecticut corporation having a principal place of business at 384 Old Turnpike Road, Southington, Connecticut 06489 ("Licensor"), and the customer identified on the signature page hereto ("Customer") as of the 24 day of June 1998 (the "Effective Date").

WHEREAS, Customer and Licensor have entered into a Software License Agreement (as defined below) pursuant to which Licensor has licensed the Licensed Software (as defined below) to the Customer for internal use only; and

WHEREAS, Licensor desires to provide to Customer and Customer desires to obtain from Licensor, the services set forth herein relating to the Licensed Software on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and in consideration of the Support Fees (as defined below) and other fees paid and to be paid by Customer, and for other consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1. DEFINITIONS.

1.1. "Additional Services" means any services, other than the Standard Support Services described in Section 2 below, that Licensor performs for Customer from time to time.

1.2. "Documentation" means the published materials provided to Customer by Licensor for the Licensed Software.

1.3. "Error" means a verifiable and reproducible failure of the Licensed Software to conform in a material respect to the Documentation. For the purposes of this Agreement and the License Agreement "Errors" do not include any nonconformity resulting from Customer's misuse, improper use, alteration or damage to the Licensed Software, or Customer's combining, using or merging the Licensed Software with any hardware or software not supplied or identified in writing as compatible with the Licensed Software.

1.4. "Error Correction" means any work around or software modification that causes the Licensed Software to substantially conform to the Documentation or a procedure or routine that, when observed in the regular operation of the Licensed Software, eliminates the practical adverse effect of an Error.

1.5. "License Agreement" means the License Agreement entered into by and between Customer and Licensor.

1.6. "Licensed Software" means the computer software identified on Schedule A, the Documentation, materials, Updates, enhancements, modifications and Error Corrections, as well as any media containing or embodying the computer software identified on Schedule A, that Licensor may provide to Customer from time to time. Licensed Software shall not include Third Party Software (as defined below).

1.7. "Releases" means a new version of the Licensed Software as designated by Licensor.

1.8. "Services" means Standard Support Services (as such term is defined in Section 2 below) and Additional Services.

1.9. "Third Party Software" means the computer software applications identified on Schedule B.

1.10. "Updates" means corrections, changes and improvements to the Licensed Software which (i) relate to the operating performance of such applications but do not change the basic function of such applications, (ii) are intended for general commercial use in connection with such applications, and (iii) are part of a standard Licensor maintenance release for such applications. Updates do not include Releases.

2. STANDARD SUPPORT SERVICES. During the Term hereof, and subject to the terms and conditions of this Agreement, Licensor shall provide Customer the following standard support services for the Licensed Software (the "Standard Support Services"):

(a) Error Correction, provided that Customer promptly reports any Error on Licensor's Standard Work Request Form (a copy of which is attached hereto as Exhibit 1) and submits such form via E-mail, facsimile, or regular mail or in any other format reasonably acceptable to Licensor, together with any other documentation reasonably requested by Licensor. Licensor shall use commercially reasonable efforts to promptly provide Error Corrections for Errors that are properly reported to Licensor. If a reported Error causes the Licensed Software to be inoperable or otherwise unable to process the transactions for which the Licensed Software is intended, Licensor shall use commercially reasonable efforts to begin troubleshooting and diagnosis of such Error within three (3) Business Hours (as defined below) of the receipt of the Licensor's Standard Work Request Form.

(b) Updates at such times and in such form as they are made available for general release to Licensor's other customers including modifications or additions to the Licensed Software due to changes in the rules and/or regulations of the federal government or federal regulatory agencies.

(c) Telephone support between the hours of 8:30 a.m. and 6:00 p.m. (Eastern Standard Time) Monday through Friday, excluding national holidays ("Business Hours"), to assist Customer in using the Licensed Software. Any other telephone support shall be deemed to be Additional Services.

Standard Support Services do not include Releases and shall not be deemed to be included in the performance warranty provided under the License Agreement.

3. ADDITIONAL SERVICES. Additional Services include, but are not limited to: installation and training with respect to the Licensed Software and Third Party Software; on-site support; provision or installation of hardware and related supplies; project administration (including project status meetings, minutes, project plan updates, business process analysis, system analysis and design, specification development and estimating); system studies; system configuration and design; customized documentation; modifications, customization or other changes to the Licensed Software; support for versions of the Licensed Software that are not Supported Versions (as defined in Section 6.2); design, installation, consulting and training with respect to Updates, enhancements or Releases of the Licensed Software; administrative expenses or; any other services not specifically enumerated in Section 2. All Additional Services shall be provided only upon the mutual agreement of the parties hereto as set forth on Schedule C and shall be subject to additional charges at Licensor's then-current hourly rates for such services, including, without limitation, travel and other expenses.

4. MAINTENANCE OF THIRD PARTY SOFTWARE. During the term of this Agreement, Licensor agrees to furnish initial support for Progress Software Corporation's Third Party Software (the "Progress Software"); provided, however, such initial support shall only be furnished if the Progress Software is obtained from Licensor and Customer pays the Third Party Software maintenance fee set forth on Schedule B. Licensor reserves the right to refer Customer directly fo Progress Software Corporation if Licensor cannot furnish the level of support required by Customer for the Progress Software

4.1. Customer agrees that if any services are required for Third Party Software (including, without limitation, installation and training with respect to the Third Party Software; on-site support; provision or installation of hardware and related supplies; project administration; system studies; system configuration and design; customized documentation; modifications, customization or other changes to the Third Party Software; design, installation, consulting and training with respect to updates, enhancements or new versions of the Third Party Software) that are not provided for by the Third party Software vendor, Customer can contact Licensor for such services. Licensor may, in its sole

discretion, provide such services for Third Party Software as an Additional Service in accordance with Section 3 above.

5. CUSTOMER RESPONSIBILITIES. If requested by Licensor, Customer shall provide Licensor, at no charge, with the accommodations, equipment, materials and services necessary to perform any Services hereunder. Without limiting the generality of the foregoing, Customer shall provide, (i) sufficient office space and administrative services, (ii) access to Customer's facilities and necessary equipment, data and documentation, and (iii) sufficient support and test time to allow Licensor to duplicate any properly reported Error. Customer shall cooperate with Licensor as reasonably necessary to assist Licensor in the performance of its obligations under this Agreement. Customer shall provide at its expense telecommunications software and hardware specified by Licensor to allow Licensor to provide Standard Support Services from a remote location. In addition, Customer shall maintain an account with a commercial E-mail service provider approved by Licensor or an Internet address to which E-mail may be sent.

6. FEES AND PAYMENT TERMS.

6.1. Support Fee. Customer shall pay Licensor the annual support fee set forth on Schedule A for the Standard Support Services (the "Support Fee"). Any changes to the Licensed Software, including without limitation increasing the number of concurrent users, changing the hardware platform or adding software applications or upgrading any existing software to a new version, shall be subject to the payment of additional Support Fees. The Support Fee is subject to further change in Licensor's sole discretion at any time during the term of hereof upon thirty (30) days' prior written notice to Customer; provided, however, that in the event that Licensor increases the Support Fee by more than ten percent (10%) in any calendar year, Customer shall be entitled to terminate this Agreement upon written notice to Licensor, in which event Licensor shall refund to Customer a pro-rata portion of Customer's Support Fee representing the period of time from the date of termination through the end of the support period.

6.2. No Support for Prior Versions. Licensor shall provide Standard Support Services for, (a) the current version of the Licensed Software and, (b) the version immediately preceding the current version (collectively the "Supported Version"). Licensor may, at its sole option and in its exclusive discretion, provide support services as Additional Services for versions of the Licensed Software that preceded the Supported Version.

6.3. Renewal. Upon expiration or termination of this Agreement, Licensor shall cease providing Standard Support Services to Customer. If Customer desires to renew Standard Support Services, Customer shall be required to pay a renewal fee equal to the one hundred fifty percent (150%) of the amount Customer would have been required to pay (including applicable increases as set forth in

Section 6.1) under this Agreement, had this Agreement not expired or been terminated.

6.4. Additional Service. Licensor shall provide Additional Services on a time and materials basis at Licensor's then-current standard hourly rate.

6.5. Expenses. In addition to the Support Fee and any fees for Additional Services, Customer shall pay for all reasonable out-of-pocket travel costs (including room and board) as well as other costs and expenses incurred in connection with any Services.

6.6. Payment Terms. Licensor shall invoice Customer annually in advance for the Support Fee. Licensor shall invoice Customer on a monthly or other periodic basis for any fees in connection with Additional Services. Customer shall be assessed and pay all sums due in U.S. Dollars within thirty (30) days following the date of any invoice. Customer shall pay a late charge of one and one half percent (1.5%) per month or the highest rate allowed by law, whichever is less, on all amounts not paid to Licensor when due hereunder. Customer shall pay to Licensor all costs of collecting any invoices or enforcing Licensor's rights under this Agreement, including reasonable attorney fees.

7. TERM AND TERMINATION.

7.1. Term. This Agreement shall commence on the Effective Date and shall terminate on the first anniversary of such date (the "Initial Term") unless sooner terminated as provided herein. This Agreement shall automatically renew for additional successive one-year terms ("Renewal Term") after termination of the Initial Term unless either party notifies the other in writing at least ninety (90) days prior to the expiration of the Initial Term or any Renewal Term that such party intends not to renew this Agreement for a successive one-year term in which case this Agreement shall terminate at the end of the then-current term. The Initial Term and Renewal term are collectively referred to as "Term".

7.2. Termination By Either Party for Cause. Either party may terminate this Agreement and all Services provided hereunder in the event the other party breaches any term of this Agreement and fails to cure such breach within thirty (30) days of receipt of written notice of the breach from the non-breaching party.

7.3. Termination by Licensor. Licensor may terminate this Agreement immediately upon notice to Customer in the event of: (i) Customer's misuse, improper use, alteration or damage to the Licensed Software or any portion thereof; (ii) Customer's breach of the License Agreement; (iii) the occurrence of software problems caused by forces external to the Licensed Software, including, but not limited to, acts of God, flooding, power or communications failures, Third Party Software and/or hardware, faulty communication lines, or any other causes beyond the control of Licensor; (iv) the bankruptcy or insolvency of

Customer or the appointment of a receiver for Customer; or (v) a violation of Section 11.3.

7.4. Termination of License Agreement. This Agreement shall automatically terminate upon termination of the License Agreement for any reason.

8. EFFECT OF TERMINATION. In the event of the termination of this Agreement for any reason:

(a) Customer shall be liable for all fees and charges incurred prior to the date of termination;

(b) the provisions of Sections 4, 9, 10 and 11 shall survive such termination and remain in full force and effect; and

(c) no Support Fees (except as explicitly set forth in Section 6.1), fees for Additional Services or other charges or expenses shall be refunded or returned to Customer.

9. NO WARRANTIES; LIMITATION OF LIABILITY.

9.1. *NO WARRANTIES. THIS IS AN AGREEMENT TO PROVIDE SERVICES* TO CUSTOMER. LICENSOR SHALL NOT BE DEEMED TO HAVE MADE ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, TO CUSTOMER. IN ADDITION, LICENSOR EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES WITH RESPECT TO THE LICENSED SOFTWARE, ANY THIRD PARTY SOFTWARE OR THE SERVICES TO BE RENDERED HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANT ABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

9.2. LIMITATION OF LIABILITY. IN NO EVENT SHALL LICENSOR BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES BASED ON ANY THEORY OF CONTRACT, TORT, STRICT LIABILITY, NEGLIGENCE OR OTHERWISE, EVEN IF LICENSOR HAS BEEN ADVISED OF, OR SHOULD HAVE KNOWN OF, THE POSSIBILITY OF SUCH DAMAGES. LICENSOR'S CUMULATIVE LIABILITY TO CUSTOMER FOR ALL CLAIMS RELATING TO ANY SERVICES PROVIDED HEREUNDER, INCLUDING ANY CAUSE OF ACTION BASED ON ANY THEORY OF CONTRACT, TORT OR STRICT LIABILITY, SHALL NOT EXCEED THE TOTAL AMOUNT OF THE SUPPORT FEES OR FEES FOR ADDITIONAL SERVICES PAID TO LICENSOR HEREUNDER DURING THE IMMEDIATELY PRECEDING TWELVE (12) MONTH PERIOD. CUSTOMER ASSUMES FULL RESPONSIBILITY FOR (A) THE CORRECTNESS OF DATA INPUT, (B) MONITORING OUTPUT TO INSURE CORRECTNESS, (C) CORRECTING INVALID DATA, AND

(D) ANY ACTION TAKEN BY CUSTOMER OR OTHERS BASED UPON THE DATA OR ANY THIRD PARTY SOFTWARE.

9.3. THE LIMITATIONS OF LIABILITY AND DISCLAIMERS OF WARRANTY STATED HEREIN FORM AN ESSENTIAL BASIS OF THE BARGAIN BETWEEN THE PARTIES AND SHALL CONTINUE TO APPLY EVEN IN THE EVENT THAT ANY EXCLUSIVE REMEDY HEREUNDER FAILS OF ITS ESSENTIAL PURPOSE.

10. NON-SOLICITATION. Customer hereby agrees not to hire or attempt to hire, directly or indirectly, any of the employees or independent contractors of Licensor, its subsidiaries or affiliates during the term of their employment with Licensor or for a period of six months after the termination of their employment with Licensor. Customer hereby agrees not to cause or attempt to cause any of the employees or independent contractors of Licensor, its subsidiaries or affiliates to terminate his or her relationship with the Licensor without the prior written consent of Licensor.

11. MISCELLANEOUS.

11.1. Independent Contractors. Each party hereto is an independent contractor and nothing contained herein shall be construed to create a partnership, joint venture or agency relationship between Licensor and Customer, nor shall either party be authorized to bind the other in any way.

11.2. Remedies Not Exclusive: No Waiver: Amendments. Except as otherwise specifically provided herein, no remedy referred to in this Agreement is intended to be exclusive. No delay by Licensor or Customer in exercising any of their respective rights or remedies hereunder shall be deemed to be a waiver of such rights or remedies. No waiver by either party of any breach by the other party hereunder shall in any way be a waiver of any future breach. Any waiver, amendment or modification of this Agreement must be in writing and signed by the party against whom enforcement is sought.

11.3. Assignment. Licensor shall have the right to transfer or assign this Agreement to any other person or entity without the consent of the Customer. Customer shall not have the right to assign or transfer this Agreement or any rights hereunder without the prior written consent of Licensor, which consent may be withheld for any reason or no reason. Any change in control of Customer, whether by merger, stock acquisition or otherwise, shall be deemed to be an attempted assignment of this Agreement and shall be grounds for termination. Subject to the prohibition on Customer's assignment, license, sub-license and transfer contained herein, this Agreement will be binding upon and will inure to the benefit of the successors and permitted assigns of the parties hereto.

11.4. Taxes. Customer agrees to pay any sales, use, import or other taxes or levies associated with this Agreement, the Licensed Software and the Services provided hereunder.

11.5. Governing Law; Jurisdiction; Costs. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida. Customer hereby irrevocably consents and agrees that any action or proceeding hereunder may be instituted in state or federal court located in Palm Beach County, Florida, and hereby irrevocably submits to the jurisdiction of such courts in any such action or proceeding. Customer shall reimburse Licensor for its reasonable costs and expenses incurred in enforcing its rights hereunder in the event of a breach or threatened breach by the Customer.

11.6. Severability. In the event that any provision of this Agreement shall be determined by a court of competent jurisdiction to be invalid or unenforceable, such provision shall, to such extent as it shall be determined to be invalid or unenforceable, be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of this Agreement.

11.7. Captions. The captions of this Agreement are solely for reference and have no legal effect whatsoever and will not in any way affect the interpretation or construction of this Agreement.

11.8. Force Majeure. Neither party will be liable for damage due to any cause beyond its control, including without limitation acts of God, acts of civil or military authority, labor disputes, failure or delay of suppliers or systems, including communications and power systems, fire, sabotage, war, embargo or acts or omissions of the other party caused by any of such events.

11.9. Notices. All notices and other communications hereunder shall be in writing and shall be deemed given: (a) upon receipt if delivered personally (unless subject to clause (b)) or if mailed by registered or certified mail receipt requested, postage prepaid; (b) at noon on the business day after dispatch if sent by a nationally recognized overnight courier; or (c) upon the completion of transmission (which is confirmed by telephone or by a statement generated by the transmitting machine) if transmitted by telecopy or other means of facsimile which provides immediate or near immediate transmission to compatible equipment in the possession of the recipient, in any case to the parties at the following addresses or telecopy number (or at such other address or telecopy number for a party as will be specified by like notice):

If to Licensor:
Ocwen Financial Corporation
The Forum, Suite 1002
1675 West Palm Beach, FL 33401
Attention: Secretary
Telecopy Number: (561) 682-8177
Confirmation Number: (561) 682-8000

With a copy to
AMOS, Inc.
P.O. Box 369
Southington, CT 06489
Attention: Daniel J. Paradis
Telephone No.: (860) 621 3796
Telephone No.: (860) 621 3796

If to Customer:
West Virginia Housing Development Fund
814 Virginia Street East
Charleston, WV 25301
Attention: Joseph Hatfield
Telephone No.: 800-933-1272
Facsimile No.: 304-343-2081

11.10. Government Requirements and Approvals. Customer hereby agrees that it will not ship or divert for use in any country any of the Licensed Software, Documentation or technical data with respect thereto in contravention of the laws and regulations of the United States or knowingly allow such shipping or diversion. Customer shall obtain all required governmental approvals necessary in connection with this Agreement. Without limiting the generality of the foregoing, Customer acknowledges that its exportation of the Licensed Software and Documentation is subject to the United States Export Administration Act of 1979, as amended (the "Act"), and Customer warrants and represents that it will comply in all respects with the Act. Customer agrees to indemnify, defend and hold harmless Licensor against any claim, loss, liability or damage suffered or incurred by Licensor arising out of or relating to any failure to comply with the Act or any rules or regulations relating thereto

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed by their respective duly authorized representatives as set forth below.

LICENSOR: AMOS, Inc.

By: Gilbert Burns

Name: [signature]

Title: President

Date: 7/10/98

CUSTOMER: West Virginia Housing ~~Development Fund~~

By: Joe W. HATField

Name: [signature]

Title: Exec Dir

Date: 6-24-98

## SCHEDULE A
## LICENSED SOFTWARE

Please note that all Support Fees are subject to increase in accordance with Section 6.1 of the Agreement.

| Licensed Software | Maintenance Fee |
| --- | --- |
| Loan Servicing! | |
| REO! | |
| Collections! | |
| GL Interface* | |
| Workflow Manger! | |
| Total: | $27,600.00 |

# SCHEDULE B
# THIRD PARTY SOFTWARE SUPPORT

Please note that all Support Fees are subject to increase in accordance with Section 6.1 of the Agreement.

| Third Party Software | Annual Maintenance Fee |
| --- | --- |
| Progress Software Version 8<br>Enterprise Server<br>Client Networking<br>ProVISION Dev. Lic<br>Actuate End User<br>Desktop | |
| | $6,434.00 |

## SCHEDULE C
## ADDITIONAL SERVICES

Hours and fees are estimates only and are subject to change.

| Service | Estimated Hours | Estimated Fee |
|---|---|---|
| Convert data from existing servicing system to Amos Loan Servicing! | 240 @ $110.00 Per hour | $26,400.00 |
| Develop interface to FiTech origination system | 120 @ $110.00 Per hour | $13,200.00 |
| Training | 120 @ $110.00 Per hour | $13,200.00 |
| Installation | 24 @ $110.00 Per hour | $2,640.00 |
| Develop customized GL Interface | 45 @ $110.00 Per hour | $4,950.00 |

** Any other Additional Services shall be provided by Licensor on a time and materials basis at the Rate of One Hundred Twenty five Dollars ($125.00) per hour.

EXHIBIT 1

STANDARD WORK REQUEST FORM



CASE 00-C-1911

WV HOUSING DEVELOPMENT FUND, A vs. OCWEN TECHNOLOGY XCHANGE, INC.,

| LINE | DATE | ACTION |
|---|---|---|
| 1 | 08/02/00 | # ISSUED SUM & 4 CPYS; F FEE; MELICK FOR P; CK; RCPT 310590 |
| 2 | 08/02/00 | # $75.00; CASE INFO SHEET; COMPLAINT W/EXH'S |
| 3 | 08/07/00 | # NON-RES BD; RCPT 310806; $100.00 |
| 4 | 08/14/00 | <SUMS W/RET AS TO OCWEN FINANCIAL ((8/8/00 SS) |

A TRUE COPY (sic)
TESTE: Cathy S. Gatson CLERK
CIRCUIT COURT KANAWHA COUNTY, W.VA

EXHIBIT

B